UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

CARLA H. VINCENT ELDER,

    Plaintiff,

v.                             4:12cv132

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Carla H. Vincent Elder ("Elder") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act.[1] Specifically Elder claims the ALJ improperly weighed the opinions of two treating physicians and improperly assessed her credibility and that of a supporting witness. Because the Commissioner's assessment of the medical opinions and witness credibility are supported by substantial evidence, this report recommends that the final decision of the Commissioner be affirmed.

---

[1] This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

## I.  PROCEDURAL BACKGROUND

Elder filed an application for SSI, alleging disability beginning March 30, 2009, due to chronic back pain, hemochromatosis and Hepatitis C.[2] (R. 152). The Commissioner denied her application initially (R. 69-80), and upon reconsideration. (R. 82-94). Elder requested an administrative hearing (R. 113), which was conducted in Newport News on October 18, 2011. (R. 32).

An Administrative Law Judge ("ALJ") concluded that Elder was not disabled within the meaning of the Social Security Act, and denied her claim for SSI. (R. 15-26). The Appeals Council denied review of the ALJ's decision (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. Elder then filed this action seeking judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND

Elder's primary limiting condition is a genetic disorder known as hemochromatosis, which results in a build-up of iron in

---

[2] At the hearing, Elder also complained of anxiety and an adjustment disorder which the ALJ found non-severe. Elder does not challenge this finding in her brief and therefore the review of medical records is limited to her work-limiting conditions.

2

the blood and can lead to organ damage and other serious complications. She primarily treated this condition with hematologist Dr. Mashour Yousef, whom she initially consulted in July, 2008. Dr. Yousef prescribed a treatment regimen of phlebotomy, during which doctors periodically remove blood in order to reduce the build-up of iron. (R. 215). Dr. Yousef explained the treatment protocol and the goal of reducing Elder's ferritin level, a measure of iron in the blood. He explained that phlebotomy would reduce the ferritin level and, with close monitoring, avoid anemia and other complications. He also expected that Elder would likely need regular maintenance phlebotomy, even after achieving the desired ferritin level of under 50. He expected these maintenance phlebotomies would occur every two to four months. (R. 216). At the time of his initial visit, Dr. Yousef also counseled Elder about avoiding alcohol, and specific foods which could exacerbate her condition. Elder began the treatment regimen that summer.

In August 2008, Elder again consulted Dr. Yousef who noted that she had not tolerated the phlebotomy well. As a result, he reduced the amount of blood to be removed with each visit and thereafter Elder received "half unit phlebotomy with IV hydration with good tolerance." (R. 221). Throughout 2009,

Elder received regular phlebotomy consistent with her tolerance and treated regularly with Dr. Yousef's office.  On each of these visits the review of her symptoms were generally consistent, with Elder describing chronic arthralgia or joint pain, for which she received care from her primary care physician.  Dr. Yousef also observed that she denied any abdominal pain, nausea, vomiting or fever, and generally reported that her energy level was stable.  (R. 229, 242, 246, 392).  In September 2009, Elder's records reflect that she was receiving regular phlebotomy approximately every two weeks with supportive hydration.  Her ferritin level was also down to 67, and Dr. Yousef again observed that the goal was to keep the ferritin level around 50.  (R. 387, 393).

In an update on August 9, 2009, Dr. Yousef's nurse practitioner, Clifford Pyne ("NP Pyne"), reported that Elder was receiving bi-weekly phlebotomy for her hemochromatosis.  She reported she was "doing well" with no chills, sweats, nausea, vomiting, diarrhea or constipation, no shortness of breath or chest pains.  NP Pyne recorded that "a 10 point review of symptoms is negative."  (R. 394).  On that visit, Elder's ferritin level had increased and she proceeded with phlebotomy treatment stating to NP Pyne that she did not like receiving it.

4

_Id._  In addition to her IV hydration, the office prescribed low-dose Ativan to help with her anxiety when receiving the therapy.

In 2010, Elder continued regular phlebotomy treatments. She consistently reported that her energy level was stable or improved and she had "good tolerance" of the half unit procedure, reporting only "mild fatigue."  (R. 373, 375, 377, 379, 380-81).  In January and February of 2011, Elder stopped phlebotomy because her ferritin level had decreased below 50. Dr. Yousef noted that she had "a remarkable response" to the treatment and that it would be resumed if her ferritin level went above 100 with the continued goal to keep it below 50.  In March, with a ferritin level of 80, Dr. Yousef resumed phlebotomy at a one-half unit every two weeks.  At the time, notes reflect Elder "was reinstated on phlebotomy without major complications, with regular clinical and laboratory evaluation." (R. 343).  Her review of symptoms on that date describe that she was "feeling much better" with "no fatigue or lack of energy." (R. 343). At the time, Elder continued to smoke and drink beer "mostly on the weekend."  (R. 344).

On October 17, 2011, Dr. Yousef wrote a two-sentence letter addressed "To Whom It May Concern" in which he stated "Ms. Carla Elder is a patient of mine who started phlebotomy treatments in

this clinic on July 25, 2008 and has received a total of 38 treatments. If you have any further questions, please contact my office." (R. 456). The October 17 letter said nothing concerning the effects of the treatment, or its impact on Elder's ability to work. The number of treatments translates to approximately one each month, but the medical evidence reveals treatment was more intensive when Elder began.

Two days later, on October 19, Dr. Yousef wrote a second letter, also addressed "To Whom It May Concern," in which he opined that Elder receives "close monitoring with phlebotomy treatment . . . that leaves her with extreme weakness and fatigue requiring someone to drive her and help her with care for several days often until Monday or Tuesday after a Friday." The second letter also stated that Elder would need to continue the treatment "intermittently" for the rest of her life. (R. 465).

In addition to Dr. Yousef, Elder regularly consulted with her primary care physician, Internist Dr. Lind Chinnery. (R. 303-31). Although Dr. Chinnery is copied on most of the medical records, there are a few records reflecting Dr. Chinnery's treatment. In general, Dr. Chinnery followed Elder for joint pain and other general conditions. At a visit in March 2010,

Dr. Chinnery noted that Elder had not undergone phlebotomy in six weeks. (R. 313). Her primary complaints related to left neck pain radiating to her arm and hand. She admitted smoking a pack of cigarettes each day and drinking up to four alcoholic drinks daily. (R. 314).

In June 2010, Elder reported a diagnosis of anemia as a result of her phlebotomy. She stated that she had fatigue and dyspnea[3] on exertion, but denied any dizziness, headache or back pain. (R. 317). Dr. Chinnery diagnosed hemochromatosis as "improved" and "benign hypertension" and continued her present treatment regimen. (R. 310). In October, Elder saw Dr. Chinnery for complaints of panic attacks and lightheadedness after phlebotomy, joint pain and difficulty sleeping. (R. 306). Her physical examination on that day was essentially normal. (R. 308). All of her medications were continued and she was directed to return to the office in four months for follow up. (R. 309).

Shortly after this October visit, on October 21, Dr. Chinnery also wrote a letter addressed "To Whom It May Concern." (R. 406). The letter states that Elder is being treated for various medical conditions including hemochromatosis and

---

[3] Dyspnea is a medical term for difficult or labored breathing. Dorland's Medical Dictionary, 31st Ed. 2007, p. 589.

7

myalgia, and that "due to her conditions she is unable to work at the present time." (R. 406).

In addition to her treating physicians, the ALJ received evidence from the DDS Medical Consultant, Dr. Leopold Moreno. Dr. Moreno reviewed Elder's medical records, including her treatment for back pain, hemochromatosis, and Hepatitis C and concluded that she was capable of lifting 20 lbs. occasionally, 10 lbs., frequently and standing or sitting for up to six hours in an eight-hour day. Dr. Moreno also suggested modest postural limitations to accommodate her back pain. (R. 73-77). On reconsideration, Dr. Carolina Longa, another DDS medical consultant, also reviewed the record and suggested similar exertional limits, but fewer postural restrictions. (R. 90-94).

At the hearing, Elder testified that she was unable to work due to a variety of conditions, including her hemochromatosis, anemia, back pain, weakness and frustration. (R. 47). She stated that she had headaches daily, and regular back pain for which she took prescription medications. (R. 55, 51).

Elder's primary complaint, however, related to her description of the three-to-four day recovery period following her phlebotomy treatments. She stated that she "almost crashed" after her first treatment when they removed a liter of blood and

she was "laid up for a week." (R. 48). Thereafter, her treatments were reduced to a half unit at a time, but Elder still testified that she experienced dizziness and fatigue after each treatment. She stated that her "balance was off," and as a result she did not drive. (R. 58).

Similarly, her landlord and friend, Carl Shellhammer, testified that Elder experienced dizziness and lightheadedness to the point of being unable to walk after each treatment. (R. 60-61). He stated that her symptoms lasted three-to-four days after each treatment. Both Elder and Shellhammer stated that the treatments were weekly, or every other week, but at the time of the hearing, Elder had not had a treatment in seven weeks and was not scheduled to return to the doctor for two more weeks. (R. 49).

In addition to the symptoms resulting from her phlebotomies, Elder also described back pain following a 2005 surgery. She stated that her back pain made it difficult for her to sit or stand for long periods. She described the pain as being a five to six on a scale of ten, but acknowledged that she had no physical therapy, injections or other treatment, instead relying exclusively on medication, which she stated "takes the edge off." (R. 51-52). She stated that she believed she could

9

lift no more than five pounds, and sit or stand only 30 minutes at a time.  (R. 53-54).

With regard to activities of daily living, Elder testified that she washed dishes, shopped for groceries, helped her daughter prepare for school, and cooked meals with her daughter's help.  (R. 50).  She also testified that she used to work in her garden and walk three times a week with her daughter, but that she was unable to do these activities as a result of her limiting medical conditions.  (R. 51).

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2008); <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. of New York v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It consists of more than a mere scintilla of evidence, but may be somewhat less than a

preponderance.   <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." <u>Craig</u>, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  <u>ANALYSIS</u>

### A. Disability Claim

To be eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirements in 42 U.S.C. §§ 1382(a) and (b), must also satisfy

the basic eligibility and definitional requirements for disability found in 42 U.S.C. §§ 1381(a) and (c).

The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted and can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

> 1.   Is the individual involved in substantial gainful activity?
>
> 2.   Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental

12

ability to do work activities?

3.  Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4.  Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.  Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears

13

the ultimate responsibility for weighing the evidence. <u>Hays</u>, 907 F.2d at 1456.

### 1. ALJ's Decision

In this case, the ALJ made the following findings under the five part analysis: (1) the ALJ found that Elder had not engaged in substantial gainful activity since March 30, 2009 (the application date); (2) Elder had severe impairments of hemochromatosis, hypertension, a disorder of the back and hepatitis C; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; (4) Elder had the RFC to perform light work involving lifting 20 lbs. occasionally and 10 lbs. frequently, with specified limitations to avoid ladders, ropes, scaffolds, and limited to simple routine tasks involving low stress. Finally, although the ALJ concluded that Elder could not perform her past relevant work, he did identify jobs which exist in substantial numbers in the national economy which Elder could perform. (R. 15-25).

In her motion for summary judgment, Elder argues that the ALJ erred in determining her RFC. Specifically, she claims that the ALJ: (1) failed to give proper weight to the opinion of two of her treating physicians, Dr. Yousef and Dr. Chinnery; and (2) did not support with substantial evidence his finding that

testimony by Elder and a supporting witness was "not credible." (ECF No. 17 at 5). The Court considers each argument in turn.

## 2. The ALJ Properly Evaluated the Evidence Bearing on Elder's RFC

While Elder does not argue for any specific change in its limitations, both her arguments effectively contend that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform her past relevant work. Id. at § 404.1545(a)(5)(i). If the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at § 404.1545(a)(5)(iii).

At the administrative hearing level, the ALJ alone has the

responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[4] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements'-i.e., opinions about what the individual can still do despite his or her impairment(s)-submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Elder has the RFC to perform a reduced range of light work, avoiding ladders and scaffolds, and limited to only simple routine, low-stress tasks. (R. 19).

a. **The ALJ properly explained the weight assigned to medical opinions.**

Elder primarily contends that the ALJ erred by assigning "little weight" to the opinions of Dr. Yousef and Dr. Chinnery, two of her treating physicians. (R. 20). She primarily relies in her brief on the disability documents completed by the physicians; two letters written by Dr. Yousef and Dr. Chinnery and addressed "to whom it may concern" (R. 406, 465), and a

---

[4] "Other evidence" includes statements or reports from the claimant, the claimant's treating and nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

certification for a disabled parking permit completed by Dr. Chinnery. (R. 454-55).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly

17

less weight." Craig, 76 F.3d at 590.

Because regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations.]" SSR 96-2p, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[5]

In his decision in Elder's case, the ALJ found, after "careful consideration of the entire record," that Elder is capable of performing a limited range of light work. (R. 19). In making the RFC determination, the ALJ provided a thorough review of Elder's treatment record including the records of treating physicians Dr. Yousef and Dr. Chinnery, along with a pain management specialist, Dr. Smith, and gastroenterologist, Dr. Eisner. (R. 19-24). As her hemochromatosis was the most limiting of her conditions, the ALJ discussed Dr. Yousef's treatment and records at length.

---

[5] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(iii).

The ALJ relied on Dr. Yousef's treating record, but explicitly afforded "little weight" to Dr. Yousef's October 19, 2011 letter stating that Elder suffered from extreme weakness for "several" days following her phlebotomy treatment. As required by SSA Rules, he also explained his decision to afford this opinion little weight, noting that the letter followed by days an earlier version which merely documented the number of treatments she received, but expressed no opinion on their effects. The ALJ observed that the change between the two letters appeared to be from Elder's self-report of subjective complaints. He noted Dr. Yousef's contemporaneous medical records did not otherwise document any lengthy period of disabling fatigue, nor did the records of any other healthcare provider. Instead, the ALJ noted that the records showed she was able to tolerate the reduced half-unit procedure well with supportive measures.

Similarly, Dr. Chinnery's opinion statement in the letters written October 21 was explicitly afforded little weight because it was inconsistent with the medical record and did not specify the duration of any expected disability. Dr. Chinnery's letter does not describe any specific limitations resulting from her conditions and as a result is closer to a pure opinion on

19

disability. The ALJ correctly noted that such conclusions are reserved to the Commissioner. (R. 24). <u>Thompson v. Astrue</u>, 442 F. Appx. 804, 808 (4th Cir. 2011) (unpublished).

By contrast, the ALJ afforded significant weight to the opinion of DDS Medical Consultant who found that Elder could perform a limited range of light work. He specifically found this opinion was consistent with the objective findings recorded in Elder's extensive medical record. It bears mention that the ALJ adopted the more limited restrictive found by Dr. Moreno in fashioning Elder's RFC.

In her motion for summary judgment, Elder essentially asks the Court to overturn the decision of the ALJ and assign more weight to the two October 2011 letter assessments from Dr. Chinnery and Dr. Yousef. Having reviewed the ALJ's report and the reasons articulated in that report, the Court finds that the ALJ supplied "good reasons" for not giving "controlling weight" to either October 2011 letter opinion. Dr. Yousef's statement in the letter opinion that Elder suffered from extreme weakness appears to have been based solely on her self-report and is not supported by the more moderate complaints in his own medical evaluations in the Record. Dr. Chinnery's report is also completely unsupported by objective medical or clinical findings

and inconsistent with the treatment record. In fact, Dr. Chinnery's statement appears to be a bald conclusion of disability which is never entitled to controlling weight. 20 C.F.R. § 404.1527(d)(1,3)(2013). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." Craig, 76 F.3d at 589. The ALJ did not err by refusing to give either of the October 2011 letter opinions controlling weight. Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991) (affirming RFC based on DDS medical consultant's evidence which was contrary to opinion evidence from treating physicians).

**b. The ALJ correctly evaluated Plaintiff's complaints of pain**

Elder next argues that the ALJ did not properly support his finding that Elder's complaints of disabling limitations were inconsistent with the medical record. (R. 19). The ALJ specifically found that the treatment records do not reflect the degree of limitations Elder alleged.

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a). A plaintiff's

21

subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of

reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3). In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id.

Although Elder satisfied her threshold burden under the two-step inquiry set forth in the regulations and adopted by the Fourth Circuit, the ALJ found that "the longitudinal medical evidence does not support the 'disabling' pain, weakness, and fatigue described by" Elder and her witnesses. (R. 20). In so

finding, the ALJ considered the entire record and documented his review in detail in the opinion. He specifically observed that statements by Elder and Mr. Shellhammer describing disabling pain and weakness were different from the repeated physical examinations during her treatment.   He also noted Elder's continued smoking and use of alcohol against medical advice as evidence that her symptoms were less severe than she reported at the hearing. The Court finds that the ALJ complied with both the regulations and Fourth Circuit precedent in evaluating Elder's testimony and that of her witnesses, and supported his decision with substantial evidence.

To the extent Elder contends that the ALJ erred in evaluating her credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstance.'" Id. (quoting NRLB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NRLB

v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)). Here, the ALJ performed the required analysis and articulated a number of reasons for not fully crediting Elder's statements and those of her witnesses. There is ample objective evidence in the Record to contradict Elder's self-report of severe limitations following her treatment and to support the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated Elder's credibility.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment, DENY the Plaintiff's motion for summary judgment, and affirm the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another

party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

```
                              _____/s/_____
                              Douglas E. Miller
                              United States Magistrate Judge
                              _____
                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE
```

Norfolk, Virginia

November 15, 2013

26

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Barbara Jean Evans-Yosief
Evans-Yosief Law Firm
1517 Hardy Cash Drive
Hampton, VA 23666

Daniel Patrick Shean
U.S. Attorney's Office
101 W. Main Street
Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____
Deputy Clerk

_____Nov. 18_____, 2013

27